UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | CRIMINAL NO. 23-CR-393 (RC) |
| | : | |
| **HACHIKOSELA K. MUCHIMBA,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

From at least December 2020 through March 2023, Defendant Hachikosela K. Muchimba, consciously chose to violate his position of trust as a United States Postal Carrier and used his position to steal over $1.6 million worth of U.S. Treasury checks and private checks from the U.S. mail. In order to facilitate his scheme, Muchimba was able to persuade at least one other postal carrier (and probably more) to assist him in stealing U.S. mail containing checks from over 30 mail routes in the District of Columbia. Muchimba deposited the checks, which had been altered and/or falsely endorsed, into bank accounts which he had opened in the name of a limited liability company, Double Blue Investments, LLC, which he purportedly operated. From the more than a million dollars' worth of ill-gotten funds, Muchimba treated himself to a lavish lifestyle of overseas travel and spent almost $100,000 at gentlemen's clubs. Muchimba was consistent, devious, and confident in executing his fraud scheme, which enabled him to get away with his theft again and again for years. All the while, beginning in 2019, Muchimba collected a salary from the U.S. Postal Service, of approximately $50,000 per year.

Not only did Muchimba abuse the trust placed in him by the U.S. Postal Service, Muchimba also abused the trust of the United States Citizenship and Immigration Services (USCIS) by lying to it and its employees multiple times in order to gain an immigration benefit –

naturalization as a U.S. citizen. Indeed, Muchimba falsely claimed to USCIS that he had not previously committed any criminal activity, all the while he was actively conducting his theft of mail and scheme to defraud. Based upon Muchimba's falsehoods to USCIS, on May 26, 2022, Muchimba took an oath of naturalization in this very Courthouse and received his naturalization as a United States citizen.

There is no evidence in the record that Muchimba has shown any remorse for violating the trust that was placed in him by the United States.[1] To reflect the seriousness of Defendant's offense, his knowing, willful, and voluntary exploitation of his position of trust, his complete lack of remorse, and to deter him and others from engaging in such behavior in the future, the Government recommends that the Court sentence Defendant to a within-guidelines term of incarceration of at least 108 months of imprisonment, followed by three years of supervised release. The Government also requests that the Court order Defendant to pay mandatory restitution in the amount of $1,675,227.31 to the United States Department of the Treasury and others. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and because Muchimba has spent the proceeds of his fraud scheme, the Court should forfeit the specific property named in the superseding indictment and impose a $1,675,227.31 criminal forfeiture money judgment against Defendant and in favor of the United States. The Court should also impose $2,000 in special assessments mandated by 18 U.S.C. § 3013(a)(1)(A)(iii), (a)(2)(A), that Defendant should be ordered to pay. Such a sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing. In addition, as a result of Defendant's conviction of

---

[1] The defendant stipulated at trial to the substance of two victims' testimony who, if called, would have testified that they did not receive their U.S. treasury checks. However, those stipulations do not indicate remorse. The government was still required to demonstrate—and the jury was required to find—that the defendant had misappropriated those checks with the requisite criminal intent.

Count Twenty, unlawful procurement of citizenship, in violation of 18 U.S.C. § 1425(a), the Court must revoke Muchimba's citizenship pursuant to 8 U.S.C. §§ 1451(e) and (f).

## I.     INTRODUCTION

On March 29, 2023, federal law enforcement agents executed a search warrant at Muchimba's personal residence. During that search, law enforcement recovered an ATM receipt that indicated Muchimba had deposited a misappropriated U.S. Treasury check in the amount of $415,173.53 a few days earlier at Sandy Spring Bank.  Muchimba withdrew approximately $13,000 of those funds before the government obtained a seizure warrant for the remining funds in that account on April 14, 2023.  Law enforcement also seized all personal identification documents that Muchimba had in his residence at that time, including: a U.S. passport; two expired passports issued by the Republic of Zambia; a current Zambian passport; a Washington, D.C., driver's license; a void Maryland driver's license; and a Social Security card.

On June 22, 2023, the Government met with Muchimba and his counsel at the U.S. Attorney's Office and presented Muchimba with a fulsome overview of the evidence against him and the charges that a grand jury would consider. After that meeting, a pre-indictment plea offer was extended to Muchimba to consider until August 15, 2023. Muchimba did not accept the proposed resolution.

On August 29, 2023, the Government filed a civil forfeiture complaint against $402,669.95 in funds seized from Sandy Spring account no. x8901 on or about April 19, 2023.[2]

---

[2] The separate civil forfeiture action was necessary because Muchimba filed a claim against the funds seized from Sandy Spring Bank in which he asserted under penalty of perjury he was the "owner" of those funds with "a valid, good faith, and legally recognizable interest in this asset." That civil forfeiture action has been resolved. There was a settlement reached with Sandy Spring Bank as to the seized funds and a default judgment was entered regarding any other possible party. *See United States v. $402,699.95* Case No. 23-cr-2527, ECF Nos. 23-27.

On September 9, 2023, an article in The Washington Post reported on the filing of that civil matter and identified Muchimba as the postal worker who had stolen "around $1.7 million in checks" from D.C. residents.

On September 19, 2023, law enforcement learned that Muchimba had booked travel on an outbound flight to Zambia scheduled to leave from Dulles International Airport on September 20. The ticket was purchased using a credit card in the name of someone other than Muchimba. Law enforcement immediately sought and obtained an arrest warrant for Muchimba. On September 20, 2023, Muchimba was arrested on that warrant at Dulles just before he boarded his flight to Zambia. At the time of his arrest, the defendant had in his luggage $2,000 in U.S. currency. Muchimba was also carrying a passport newly issued by Zambia on July 19, 2023.

On November 9, 2023, a federal grand jury sitting in the District of Columbia returned a 20-count Indictment charging Muchimba in Count One with conspiracy (to commit theft of mail and bank fraud), in violation of 18 U.S.C. § 371, in Counts Two through Eleven with theft of mail and aiding and abetting and causing an act to be done, in violation of 18 U.S.C. §§ 1708, 2, in Counts Twelve through Eighteen with bank fraud and aiding and abetting and causing an act to be done, in violation of 18 U.S.C. §§ 1344, 2, in Count Nineteen with engaging in monetary transactions in property derived from a specified unlawful activity and aiding and abetting and causing an act to be done, in violation of 18 U.S.C. §§ 1957, 2, and in Count Twenty with unlawful procurement of naturalization, in violation of 18 U.S.C. § 1425(a). The indictment contained a forfeiture allegation that upon conviction Muchimba would forfeit to the United States the following specific property: (a) $402,669.95 in funds seized from Sandy Spring account no. x8901 on or about April 19, 2023; (b) $1,480, in U.S. currency seized from defendant's residence on or about March 29, 2023; and (3) $2,000 in U.S. currency and a

forfeiture money judgment equal to the amount of any and all property constituting or derived from proceeds traceable to the offenses and/or any and all property involved in the money laundering count. On January 30, 2025, a federal grand jury sitting in the District of Columbia returned a superseding indictment which charged Muchimba with the same counts and notified him of the forfeiture allegation.

On March 13, 2025, after a jury trial on the charges contained in the superseding indictment, a jury found Muchimba guilty of all of the charges. A sentencing hearing is scheduled for September 3, 2025 at 10:00 a.m.

## II.     FACTUAL BACKGROUND

The evidence at trial was irrefutable – Defendant's fraudulent criminal activity spanned over two years and was not accidental but repeated over time in various ways. The fraud scheme took planning, forethought, and the cooperation of others to effectuate the scheme. Muchimba also conducted his fraud scheme while lying to USCIS officials to obtain his U.S. citizenship.

Through the testimony of victims of his mail theft, the testimony of Government employees, and from various records, the Government proved to the jury beyond a reasonable doubt that from December 2020 until March 2023, Muchimba conspired with others to conduct a scheme to defraud using his position as a U.S. Postal Service letter carrier out of the U.S. Post Office at the Friendship Station located on Wisconsin Avenue in the District of Columbia to steal mail and fraudulently deposit into defendant's accounts over 100 U.S. Treasury checks and private party checks. The stolen checks, which totaled over $1.6 million, and were intended for and mailed to postal customers living in the District of Columbia, on over 30 different mail routes. The evidence at trial showed that Muchimba and/or another individual altered and/or

falsely endorsed the stolen checks before depositing them into Muchimba's bank accounts held under the name of his limited liability company, Double Blue Investments, LLC.

The evidence at trial showed that Muchimba knowingly, intentionally, and deliberately violated and abused his position of trust with the US Postal Service. On or about February 5, 2019, when he began his employment with the United States Postal Service Muchimba signed an oath in which he agreed to protect the integrity of the mail. The oath specifically states in pertinent part, the duties of a postal service employee:

> As a Postal Service employee you must preserve and protect the security of all mail in your custody from unauthorized opening, inspection, tampering, delay, reading of the contents or covers, or other unauthorized acts. . . .
>
> I understand that it is my duty to report immediately to my supervisor or to a Postal Inspector any inforamtion I may have of any theft, pilferage, unlawful dely or mail, or evidence of intent to commit such a crime. I fully understand that it is a crime, punishble by fine or imprisonment, or both to knowingly or willfully obstruct or delay the mail, or to steal or attempt to steal mail of any kind, even if iaa appears to be worthless, or to allow others to do so. My signature below indicates that I have read and fully undersand the above and I will comply.

Not only did the defendant not uphold his oath to preserve and protect the mail, but he actively, knowingly, and intentionally used his position to steal mail from his Postal route and to gain access to mail from other carriers' routes in order to deposit stolen Treasury checks and other third-party checks into his bank accounts. Every time Muchimba deposited one of those altered and/or falsely endorsed checks into his bank accounts (sometimes while wearing his U.S. Postal uniform), he was lying and deceiving the financial institutions. Muchimba knew full well that he did not have the right to the money from those checks, yet he continued to deposit them again and again.

The only explanation for Muchimba's criminal activity is greed. He had solid employment with a decent salary. There is no evidence that he needed the funds for a dire situation. Instead, the jury heard testimony regarding how Muchimba spent the ill-gotten funds – he transferred a small amount of the ill-gotten funds to other postal employees, withdrew large sums of cash, and frivolously spent most of the funds on entertainment and travel.

During the time that Muchimba was committing his theft of mail and fraud schemes, he voluntarily applied for naturalization to become a United States citizen. The evidence at trial was clear and consistent – he lied on his sworn application for naturalization to USCIS by denying engaging in any criminal activity, he then lied to the USCIS employee interviewing him, including denying that he had never given any U.S. Government officials any information that was false, fraudulent, or misleading, and he lied again when he answered similar questions under oath prior to his naturalization ceremony. Muchimba made these lies while under oath and having signed an attestation before the USCIS officer. Indeed, Muchimba attested that "I certify under penalty of perjury that each answer provided above made by me or at my direction, that I reviewed and understand all of the questions and answers provided, and that each answer is true and correct as to the date of Naturalization Oath Ceremony."

Muchimba's lies to USCIS were not an accident. They were deliberate, and he lied because he wanted citizenship – which he got due to his lies. As was testified to during the trial, had the USCIS officers known that Muchimba had lied to them and had committed mail theft and a fraud scheme, he would not have qualified to become a naturalized United States citizen. The evidence at trial showed that during the pendency of his naturalization application – between September 19, 2021, and May 26, 2022, Muchimba deposited more than $450,000 worth of

7

stolen checks into bank accounts that he controlled. Moreover, he continued his scheme even after receiving his naturalization certification.

**III.   THE APPLICABLE SENTENCING GUIDELINES RANGE**

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for a sentencing determination.  *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Cano-Flores,* 796 F.3d 83, 90 (D.C. Cir. 2015) ("[T]he first step for the sentencing court is to calculate the [Sentencing Guidelines] range").  While 18 U.S.C. § 3553(a) instructs the Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2), the defendant's Guidelines range is one factor the Court must consider in determining an appropriate sentence.  18 U.S.C. § 3553(a)(4).

According to the Presentence Report, the U.S. Sentencing Guidelines calculation for the defendant's offenses in Group 1[3] are based upon the highest charge of bank fraud, and aiding and abetting and causing an act to be done, in violation of 18 U.S.C. § 1344(2) and 2:

| | |
|---|---|
| Base Level Offense §2B1.1(a)(1)(A) and (B) | 7 |
| Specific Characteristic §2B1.1(b)(1)(I)<br>(More than $1,500,000, but less than $3,500,000) | +16 |
| Specific Characteristic §2B1.1(b)(2)(A)(i)<br>(Involved 10 or more victims) | +2 |
| Specific Characteristic §2B1.1(b)(10)(C)<br>(Sophisticated Means) | +2 |
| Role in the Offense<br>(Organizer, leader, manager, or supervisor) | +2 |
| Role in the Offense<br>(Abuse of Trust) | +2 |

---

[3] Group One includes Counts One through Count Nineteen. *See* PSR ¶¶ 47-52.

|  |  |
|---|---|
| Total: | 31 |

According to the Presentence Report, the U.S. Sentencing Guidelines calculation for the defendant's offense in Group 2, which only includes Count Twenty,[4] unlawful procurement of citizenship or naturalization, in violation of 18 U.S.C. §1425(a):

| | |
|---|---|
| Base Level Offense §2L2.2(a) | 8 |
| Specific Characteristics | 0 |
| Total | 8 |

Because there are multiple counts, pursuant to U.S.S.G. §3D1.4(a), (b), and (c), there is only one unit and no increase under the table in U.S.S.G. §3D1.4. Therefore, the combined offense level is 31. The defendant has not shown any acceptance of responsibility, so he does not qualify for a reduction under U.S.S.G. §3E1.1. Moreover, pursuant to U.S.S.G. §4C1.1(a)(10), Muchimba is not eligible for the Zero-Point Offender Adjustment. The total offense level under the U.S.S.G. is 31 (108 months to 135 months' incarceration).

IV.   **RECOMMENDATION**

    A.   **Analysis of the Sentencing Factors Under Section 3553(a)**

After calculating the applicable Guidelines range, the Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the

---

[4] *See* PSR ¶¶ 53, 63-70.

seriousness of the offense to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the Guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims.  18 U.S.C. § 3553(a)(1)-(7).

1. **Nature and Circumstances of the Offense and Its Seriousness**

The nature and circumstances of Muchimba's criminal activity demonstrates his clear criminal intent to defraud not only the United States Postal Service, but also over 100 postal customers, financial institutions and USCIS. Thus, the effects of Muchimba's actions spread far and wide. Soon after coming to the United States, Muchimba obtained employment with the U.S. Postal Service. Being a U.S. postal carrier is a trusted position that comes with responsibilities to the public and the government. As a postal employee, Muchimba had a duty to keep the U.S. mail safe. Instead, he chose to use his position and access to the mail to seek out over $1.6 million in U.S. Treasury checks and other private party checks to steal, alter and fraudulently endorse, and deposit into his bank account for his personal use.  Muchimba's scheme lasted for almost three years, was highly effective, and he gained significant funds at the expense of his victims and the U.S. government.

As the trial in this matter showed, Muchimba committed even more fraud against the U.S. government. Beginning on or about September 19, 2021, Muchimba voluntarily began the naturalization application and process. At that time, Muchimba had already stolen and deposited into his accounts at least 28 checks from postal customers and lied when he was asked on his

10

application form whether he had committed any crimes for which he had not been arrested. Muchimba continued to lie to USCIS, and he continued his scheme to steal mail even after he obtained his naturalization on May 26, 2022. Given the breadth of his scheme, the number of victims, the frequency of his falsehoods, and the duration of his criminal activity, the nature and circumstances of Muchimba's criminal activity warrants a significant period of incarceration.

### 2. The History and Characteristics of the Defendant

The PSR does not suggest that Muchimba was mentally and/or emotionally incapable of avoiding his criminal conduct; instead, he chose to engage in criminal conduct intentionally and repeatedly because it was profitable. The defendant is a 45-year-old man, who was raised in an upper-income household in Zambia amongst an intact family. He is educated having graduated from high school and received a bachelor's degree in accounting in Zambia. He also received a certification in gemology in 2014. In addition to being a naturalized U.S. citizen, Muchimba has citizenship from his native country, Zambia.

In 2015, Muchimba married a U.S. citizen, but does not live with her.[5] He has no children. Since at least September 2023, when defendant was released in this matter, Muchimba has lived with a sister and nephew.[6] Muchimba indicated that he came to the United States in 2018 and became employed by the United States Postal Service in 2019, where he was employed until his criminal activity was discovered, and he was placed on leave. The defendant does not have a criminal history.

---

[5] Defendant married his wife in 2015. She has three adult children who are in their thirties. *See* PSR ¶ 88.

[6] At his initial appearance, Muchimba indicated that he was going to live with another woman but that arrangement quickly fell through and he moved in with his sister and nephew.

11

As stated earlier, Muchimba's actions were not one isolated incident. He did not commit a one-time out-of-character mistake. On the contrary, Muchimba was not employed by the USPS that long before he began his scheme to steal the mail and deliberately implemented his scheme over the course of years, including getting assistance from others.

There is no evidence that Muchimba has accepted responsibility for his actions or that he appreciates the seriousness of the criminal activity. Indeed, when it appeared that charges against Muchimba seemed imminent, on September 19, 2023, Muchimba booked a ticket to Zambia using a card in the name of someone else and was arrested as he was trying to board the flight. *See* PSR ¶ 34. Muchimba was carrying a newly issued Zambian passport at the time. *Id*.

In order for there to be a sufficient deterrent for Muchimba to cease committing crimes, the government recommends a within Guidelines sentence of a total term of incarceration of at least 108 months for his convictions of conspiracy, bank fraud, money laundering and unlawful procurement of naturalization, followed by three years of supervised release, an order of restitution and a criminal forfeiture of specific property and a criminal money judgment.

### 3. The Need to Promote Respect for the Law and Deter Similar Criminal Conduct

The sentence should reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). A prison sentence of incarceration of at least 108 months would reflect the longevity of the defendant's scheme, the number of victims, the lack of evidence of remorse, the abuse of defendant's position of trust and his seeming willingness to continue his criminal conduct by lying to USCIS for the purpose of obtaining U.S. naturalization, will accomplish the relevant purposes of U.S.S.G. § 3553(a)(2); that is: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] (B) to afford

adequate deterrence to criminal conduct[.]" Given Muchimba's background and experience, there does not appear to be any reason for him to have breached the trust of the United States Postal Service, his postal customers, the financial institutions, or the United States government.

As important is the Court's consideration of the possible deterrent effect that a sentence in this matter may have on others contemplating committing this type of fraudulent scheme. Section 3553(a) is not limited to the necessary sentence to deter the defendant from engaging in further criminal conduct (specific deterrence), but also includes consideration of deterring other potential criminals from engaging in similar conduct (general deterrence). *See, e.g., United States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) ("The plain language of the statute . . . also militates against limiting the authority of the court to specific deterrence. . . . We note that this conclusion comports with the longstanding and uncontroversial practice of considering general deterrence in sentencing."). From the standpoint of general deterrence, a sentence of at least 108 months of incarceration will send a strong message to all who seek to defraud that such acts will not be tolerated.

B.     The Defendant Should Be Required to Pay Restitution to the Victim

The crime of mail fraud is an "offense[s] against property under" Title 18, and thus falls under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. As a result, the Court must order that "the defendant make restitution to the victim of the offense[s]." 18 U.S.C. § 3663A(a)(1). The government submits that the defendant owes restitution to the victims totaling $1,675,227.31. Some of those funds should be paid to the U.S. government which in many instances has already issued replacement checks to individual victims. But in some instances, victims themselves have incurred the loss and should be made whole. The government

13

anticipates providing the Court with a chart that includes restitution information at the sentencing hearing.

      **C.  The Defendant Should be Required to Forfeit Specific Property and Pay a Forfeiture Money Judgment**

"Criminal forfeiture is not an independent substantive offense, nor is it even an element of an offense. It is instead 'an aspect of punishment imposed following conviction of a substantive criminal offense.'" *United States v. Day*, 416 F. Supp. 2d 79, 84 (D.D.C. 2006) (quoting *Libretti v. United States*, 516 U.S. 29, 39 (U.S. 1995)), aff'd in part on other grounds and rev'd in part on other grounds, 524 F.3d 1361 (D.C. Cir. 2008). Criminal forfeiture may take the form of: (1) an *in personam* money judgment against the defendant; (2) forfeiture of specific assets; and (3) forfeiture of "substitute assets" if the directly forfeitable assets are unavailable. *United States v. Zorrilla-Echevarria*, 671 F.3d 1, 5-6 (1st Cir. 2011) (citation omitted). Federal Rule of Criminal Procedure 32.2 governs criminal forfeitures. Here, the government requests that the Court order the forfeiture of the specific property set forth in the superseding indictment: (1) $402,669.95 in funds seized from Sandy Spring account no. x8901;[7] (2) $1,480 in U.S. currency seized from Muchimba's residence on or about March 29, 2023; and (3) $2,000 in U.S. currency seized from Muchimba at the time of his arrest. As well as impose a forfeiture money judgment against the defendant in the amount of $1,675,227.31 reflecting the amount of proceeds he received from his fraud scheme. A proposed order of forfeiture will be presented to the Court at the time of sentencing.

---

[7] As noted earlier, these funds have already been forfeited in a default judgment in the civil forfeiture action and there has been a settlement with Sandy Spring Bank.

**D.     It is Mandatory that the Court Revoke Defendant's Naturalization**

Pursuant to 8 U.S.C. § 1451(e), "When a person shall be convicted under section 1425 of Title 18 of knowingly procuring naturalization in violation of law, the court in which such conviction is had **shall** thereupon revoke, set aside, and declare void the final order admitting such person to citizenship, and shall declare the certificate of naturalization of such person to be canceled. Jurisdiction is conferred on the courts having jurisdiction of the trial of such offense to make such adjudication." (Emphasis added). Therefore, as part of defendant Muchimba's sentencing, the Court is required to revoke defendant's U.S. citizenship and have him return to the U.S. government any U.S. passport and/or naturalization certificates.[8]

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should sentence the defendant to a total of at least 108 months incarceration, followed by three years of supervised release, and be ordered to pay restitution and a forfeiture money judgment each in the amount of $1,675,227.31, and a special assessment of $2,000. In addition, that the specific property listed in the indictment be forfeited to the United States. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing. In addition, the Court should revoke defendant's naturalization and order him to return to the U.S. government any U.S. passport and/or naturalization certificates.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

---

[8] Once an individual has been denaturalized, he/she returns to his/her previous immigration status and may be subject to removal.

|     |     |
| --- | --- |
| By: | \_\_/s/ *Diane G. Lucas*_____ |
|     | JOHN W. BORCHERT (D.C. Bar No. 472824) |
|     | DIANE G. LUCAS (D.C. Bar No. 443610) |
|     | Assistant United States Attorneys |
|     | 601 D Street, NW, Room 5.238 |
|     | Washington, D.C. 20530 |
|     | Borchert: (202) 252-7679 |
|     | Lucas: (202) 252-7724 |
|     | John.Borchert@usdoj.gov |
|     | Diane.Lucas@usdoj.gov |